UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ACCESS FOR THE DISABLED,
INC., etc., et al.,

        Plaintiffs,

v.                         CASE NO.  8:13-CV-3158-T-17TGW

EDZ, Inc.,

        Defendant.

_____/

ORDER

The Court conducted a jury trial on April 6, 8 and 9, 2015 on the Plaintiffs' claims, and Defendant's Counterclaim.  The jury verdict is advisory as to Plaintiffs' claims.

In the Complaint (Dkt. 1), Plaintiffs Access for the Disabled, Inc. and Patricia Kennedy seek entry of a declaratory judgment that determines that Defendant EDZ, Inc. at the commencement of this lawsuit was in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. Sec. 12181 et seq., and the Florida Accessibility Code. Plaintiffs further seek injunctive relief against Defendant, including an order to make all readily achievable alterations to the facility, or to make such facility readily accessible to and usable by individuals with disabilities to the extent required by the ADA and the FAC; and to require Defendant EDZ, Inc. to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford all offered goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities.  Plaintiffs further seek the award of attorney's fees, costs and litigation expenses pursuant to 42 U.S.C. Sec. 12205.

Case No. 8:13-CV-3158-T-17TGW

In the Complaint, Plaintiffs alleges:

1.   The facility fails to adhere to a policy and procedure to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities in violation of 28 C.F.R. Part 36.302.

2.   The facility fails to properly maintain accessible features and equipment required to be readily accessible to and usable by persons with disabilities in violation of 28 C.F.R. Part 36.211.

3.   The facility fails to provide required grab bars in all restrooms in violation of section 604.5.1 and 604.5.2 of the new ADAAG and 4.17.6 of the old ADAAG, whose resolution is readily achievable.

4.   The facility fails to adhere to all the required reach limitations, violating section 308.2.1 of the new ADAAG and 4.2.5, 4.2.6 of the old ADAAG, whose resolution is readily achievable.

5.   There is insufficient floor space to access all the features in the restroom, violating section 305.5 and 305.3 of the new ADAAG and 4.2.4 of the old ADAAG, whose resolution is readily achievable.

6.   The facility fails to properly wrap the plum[b]ing in all the restrooms, violating section 606.5 of the new ADAAG and 4.19.4 of the old ADAAG, whose resolution is readily achievable.

7.   The size and arrangement of the toilet stall provided by the facility is insufficient and fails to meet the requirements of ADAAG, section 604.3.1 of the new and 4.17.3 of the old, whose resolution is readily achievable.

8.   The door has [an] improper handle for disabled persons, in violation of section 309.4 of the new ADAAG and 4.13.9 of the old ADAAG, whose resolution is readily achievable.

Case No. 8:13-CV-3158-T-17TGW

> 9. The urinal provided by this facility does not meet the height
> requirements of ...section 605.2 of the new [ADAAG] and
> 4.18.2 of the old [ADAAG], whose resolution is readily
> achievable.

(Dkt. 1, pp. 4-5).

## I. Preliminary Issues

A.  Dkt. 114   Request for Judicial Notice
    Dkt. 116   Request for Judicial Notice

At the jury trial of this case, Defendant requested that the Court take judicial notice of 42 U.S.C. Sec. 12181 as it defines "readily achievable." Defendant further requested that the Court take judicial notice of the 2012 Florida Building Code, in particular:

> "...The Florida Building Commission updated the Florida Accessibility
> Code for Building Construction for consistency with the 2010 ADA
> Standards and Florida law, Part II, Chapter 553, Florida Statutes, in the
> summer of 2011. The intent as established by s. 553.502, Florida
> Statutes, is to maintain the U.S. Department of Justice certification of the
> Code as substantially equivalent to the ADA Standards so compliance
> with the Code provides presumption of compliance with ADA Standards.
> The 1997 Florida Accessibility Code for Building Construction was
> certified by DOJ, however, the 2012 Florida Accessibility Code for Building
> Construction must also be reviewed and certified by DOJ. Until the review
> is completed and DOJ notifies the State the 2012 Code is certified all
> parties should maintain diligence to ensure compliance with both the 2010
> ADA Standards for Accessible Design and the 2012 Florida Accessibility
> Code. Note: Code certification provides presumption of rebuttable
> evidence of compliance with the ADA for private entities (Title III entities)
> but not public entities (Title II entities).

B.  Plaintiffs' Request for Judicial Notice

At trial, Plaintiffs requested that the Court take judicial notice of the final judgment entered in Case No. 8:12-CV-2186-T-EAJ, a final judgment entered in favor

Case No. 8:13-CV-3158-T-17TGW

of Plaintiffs and against Defendant (Dkt. 80).

C.      Judicial Notice

At trial, Edward Zigman testified that he made Plaintiffs aware of his plans for modification to comply with ADA standards, at his deposition in July, 2013 and at the trial in Case 8:12-CV-2186-T-EAJ, based on the funds available.  Mr. Zigman testified:

> Q.  Excuse me, Mr. Zigman, you said based on funds; can you explain what you mean?
>
> A.  I didn't have any money....my personal financials were in the toilet.  And my wife and I had to file bankruptcy and that was like 2012, I believe in October, and we just had too much debt and I couldn't take any payroll out of the stores because they weren't making enough so I am paying for this, you know, out of my pocket....
>
>     ...
>
> Q.  Did you make the plaintiff or plaintiff's attorney aware of your bankruptcy at the trial?
>
> A.  Yes, I did.

The Court takes judicial notice of the docket of Case No. 8:13-bk-15091-CPM, a Chapter 13 proceeding filed by Edward Zigman and Dorothy Zigman on November 14, 2013.

After consideration of the testimony, exhibits, pre-trial stipulation, and argument of counsel, the Court makes the following findings of fact and conclusions of law as to Plaintiffs' ADA claims.  To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such.  To the extent that any of the conclusions of law might constitute findings of fact, they are adopted as such.

4

Case No. 8:13-CV-3158-T-17TGW

**II. Findings of Fact**

1.    Plaintiff Access for the Disabled, Inc. is a Florida not for profit corporation which maintains its principal office at 1440 Coral Ridge Drive, #415, Coral Springs, Florida. Plaintiff Access for the Disabled, Inc. advocates for the rights of the disabled.

2.    Plaintiff Patricia Kennedy serves as a director of Access for the Disabled, Inc. Plaintiff Kennedy signed the 2014 Annual Report in her capacity as Secretary Treasurer of Access for the Disabled, Inc.

3.  Plaintiff Patricia Kennedy resides in Tamarac, FL.

4.  Plaintiff Patricia Kennedy is disabled due to an incomplete C-5,6 injury caused by an auto accident in 1988.   Plaintiff Kennedy has weakness on her right side, and her balance is impaired.  Although Plaintiff Kennedy can walk a few steps, Plaintiff Kennedy uses a wheelchair for mobility.

5.  Defendant EDZ, Inc. operates two Subway restaurants, Subway #336 and Subway #468.  This case involves Subway #468.

6.  Subway #468 had its first certificate of occupancy prior to January 26, 1992.

7.  At the time that Plaintiff Kennedy and Peter Lowell first went to Subway #468, Defendant EDZ, Inc. had not altered the building from the condition it was in when Defendant EDZ, Inc. first took possession and began operating the restaurant.

8.  Plaintiffs sued Defendant EDZ, Inc. for violations of Title III of the ADA as to Subway #336 in Case No. 8:12-CV-2186-T-EAJ.  That case was commenced on October 1, 2012.   A bench trial was conducted before United States Magistrate Judge Elizabeth

5

Case No. 8:13-CV-3158-T-17TGW

Jenkins on November 21, 2013 at the United States Courthouse, 801 N. Florida Ave.,
Tampa, FL (Dkt. 76).   Plaintiff Patricia Kennedy appeared and testified at the bench
trial conducted on November 21, 2013.   A final judgment in favor of Plaintiffs Access
for the Disabled and Patricia Kennedy and against Defendant EDZ, Inc. was entered on
August 29, 2014 (Dkt. 80).

9.   On October 17, 2012, the National ADA Accessibility Compliance Network, Inc.
invoiced Defendant EDZ, Inc. d/b/a Subway #468 in the amount of $330.50 for the ADA
Assessment -Consultation-Report re Readily Achievable Compliance.  (Def. Trial
Exhibit K).

10.  Edward Zigman, President of EDZ, Inc., was deposed in Case No. 8:12-CV-2186-
T-EAJ on July 12, 2013.  In the deposition, Edward Zigman was questioned as to
Subway #336 and Subway #468  (Dkt. 7).

11.  In his deposition, Edward Zigman testified:

> Q.     So, as far as you know this is the only incident you
>        ever had anybody complain about, file any complaints
>        about your building not being in compliance with the
>        ADA?
>
> A.     No, I never had–
>
> Mr. Cullen:  Object to the form.
>
> Q.     So this is the first, this complaint was the first time
>        you were ever made aware that your building was not
>        in compliance with the ADA, correct?
>
> Mr. Cullen:  Object to the form.
>
> The Witness: Yes.

Case No. 8:13-CV-3158-T-17TGW

Q.          And you testified earlier that as soon as you were
            made aware you actually went to an ADA company to
            figure out how to bring your company, your building
            into compliance, correct?

Mr. Cullen:  Object to the form.

The Witness: Yes.  National ADA, I brought them in, sort of like a consultant I
            guess.

Q.          And actually, in fact what you did was you were so
            concerned that your building was not in compliance
            with the ADA that you had an inspection on your
            building as well, correct?

Mr. Cullen:  Object to the form.

The Witness: Yes.

Q.          And you received a report for that other building , too?

A.          Yes.

Q.          Actually that building has never received an ADA complaint either,
            correct?

A.          No.

Q.          Actually you're not being sued under the ADA for that building,
            correct?

A.          No.

Q.          But you paid money to bring that building into compliance as well,
            correct?

A.          Yes.

Q.          Were you ever made aware of any continuing
            practice by your employee of violating the ADA?

Mr. Cullen:  Object to the form.

7

Case No. 8:13-CV-3158-T-17TGW

The Witness: Repeat that, I'm sorry.

Q.       Were you ever made aware that your employees were violating the
         ADA?

A.       Made aware of, no, they never did.

Q.       As far as you know you had some kind of, excuse me, as far as
         you know you tried to make your employees comply with the ADA,
         correct?

Mr. Cullen:   Object to the form.

The Witness: Yes.

Q.       If somebody in a wheelchair came and visited your place what
         would you tell your employees to do?

Mr. Cullen:   Object to the form.

The Witness: Take care of this person however he wants to be taken care of.  If
             he wanted to be lifted into the dining area we lifted them into the
             dining area.  I never had a complaint.

Q.       So your employees knew that if anybody needed assistance they
         were to assist that person?

A.       Absolutely.

Mr. Cullen:   Object to the form.

The Witness:  Standard procedure.

Q.       That was standard procedure for your company?
         All these changes you made to your building they were motivated
         by your awareness, correct?

A.       Yes.

Mr. Cullen:   Object to the form.

Q.       This litigation is incidental to those changes made, correct?

8

Case No. 8:13-CV-3158-T-17TGW

     Mr. Cullen:   Object to the form.

     The Witness: Yes.

(Dkt. 7, pp. 89-92).


12.    In his deposition of July 12, 2013, Edward Zigman further testified:

     Q.     Is there any training or policies to abide by the ADA which your employees are trained under?

     A.     Yeah, we instituted literally a paper trail with rules and regulations that were taken off the ADA, National ADA thing and just common sense. And my whole philosophy is the golden rule. Just treat everybody as if that person was you and take care of them any way possible.

     Q.     Did you ever contact any government agencies to find out about ADA compliance?

     Mr. Cullen:   Object to the form

     The Witness:  I called the ADA, I think it's like a–I got it on the Internet, I don't even know what it was, but I dialed the number and they were very nice.

     Q.     And what did you ask them?

     A.     I asked them, you know, what things we can do and how we should do it, and the last thing was about handling animals, what do you call it, service dogs.

     Q.     So today your restaurant has a policy based on what the ADA hotline told you?

     Mr. Cullen:   Object to the form.

     The Witness: Yes, somewhat, yeah, in part.

(Dkt. 7, pp. 94-95).

Case No. 8:13-CV-3158-T-17TGW

13.   At the bench trial relating to Subway #336, on cross-examination Plaintiff Kennedy was questioned about the address of the hotel where Plaintiff was staying on November 20, 2013.  Plaintiff Kennedy testified:

> Q. So you don't know what town the hotel is (sic) that you are staying at? That you stayed at last night, correct?
>
> A. It was in this area.  It's not far from here.
>
> Q. It's in the Tampa area, correct?
>
> A. Yeah.

(Dkt. 97, p. 26).

14.   At the bench trial relating to Subway #336, Plaintiff Kennedy testified:

> Q. When you travel with Peter Lowell, the purpose of your travel is to verify complaints; correct?
>
> A. Yes.

(Dkt. 97, p. 23).

15.   Peter Lowell appeared and testified at the bench trial on November 21, 2013 relating to Subway #336.  As to Subway #468, Peter Lowell testified:

> Q. Now, when you visited the defendant's other restaurant, that was yesterday, right?
>
> A. Correct.
>
> Q. You did not go there with any kind of measuring tools, correct?
>
> A. I brought a tape measure into the bathroom with me.
>
> Q. You didn't bring a camera this time, correct?

Case No. 8:13-CV-3158-T-17TGW

A.    Yes, I brought a camera.

Q.    This is the first time you have actually visited that restaurant;
correct?

A.    Correct.

Q.    Where do you reside?

A.    Hollywood, Florida.

Q.    The purpose of your visit was to prepare for this litigation,
correct?

A.    My visit to where?

Q.    Your purpose to [sic] your visit at the other restaurant was
for this litigation, correct?

A.    Are you asking why did I visit that other restaurant?  Or why
did I visit Tampa or St. Petersburg?

Q.    The purpose of your visit to defendant's other restaurant—

A.    Yes.

Q.    —was for the purposes of this litigation; correct?

A.    I—yes.

Q.    So you're not aware of any contract that exists to remedy
that restaurant, correct?

A.    I'm sorry.  I didn't understand what you said.

Q.    You're not aware of any contracts that exist to remedy that
other restaurant; correct?

A.    I'm not aware of that.

Q.    You are not aware of the financial condition of that
restaurant, correct?

Case No. 8:13-CV-3158-T-17TGW

    A.     I'm not aware of any financial records.

(Dkt. 97, pp. 73-74).

16. On November 14, 2013, Edward Zigman and Dorothy Zigman filed a voluntary Chapter 13 Petition in United States Bankruptcy Court, Case No. 8:13-bk-15091-CPM.

17. On December 17, 2013, Plaintiffs Access for the Disabled, Inc. and Kennedy filed a Complaint against EDZ, Inc. for Title III violations of the ADA as to Subway #468, Case No. 8:13-CV-3158-T-17TGW.

18. On January 8, 2014, Edward Zigman executed an Americans With Disabilities Act Remediation Loan Application in the amount of $3,000.00 with Doctor's Associates, Inc. Dorothy Zigman executed the Application on January 9, 2014. (Def. Trial Exh. M).

19. On April 23, 2014, the Court ruled on Defendant's Motion to Stay Discovery or in the Alternative Objection to Plaintiff's Request of Entry Upon Land for Inspection and Other Purposes (Dkt. 14), granting the Motion in part to the extent that Plaintiffs' inspection of the facility was limited to the facility's restrooms (both the men's and women's restrooms.) (Dkt. 25).

20. Edward Zigman filed his Affidavit (Dkt. 51-1) on September 2, 2014, in which Mr. Zigman states:

    4.     I am the owner and operator of the Subway located at 9301 4th Street North, St. Petersburg, FL 33702.

    5.     On or about October 2012, I paid for and obtained an ADA accessibility inspection and evaluation report for the above mentioned property.

Case No. 8:13-CV-3158-T-17TGW

6. Pursuant to that report, I developed a plan to bring the above referenced property into compliance with the ADA.

7. I made the Plaintiff, Patricia Kennedy and Access for the Disabled Inc, as well as their attorney, Philip Cullen, aware of my plans to bring this subject property into ADA compliance during my deposition on July 22, 2013.

8. Since July 22, 2013, I have made continuous changes to the subject property to bring the property into ADA compliance.

9. On July 10, 2014, I received correspondence from my architect that the restroom at the subject property is in compliance with ADA and the 2010 Florida Accessibility standards.

21. In the trial relating to Subway #468, Plaintiff Kennedy appeared and testified on April 6, 2015. On direct examination, Plaintiff Kennedy testified on that she went to Subway #468, 9301 4th Street N., St. Petersburg, FL 33702 on November 20, 2013 and bought lunch. (Pl. Trial Ex. 2, Receipt).

22. On direct examination, Plaintiff Kennedy testified that Plaintiff Kennedy travels to the Tampa Bay area often for business and pleasure. Plaintiff Kennedy testified that she often travels to the Tampa Bay area for advocacy purposes, to confirm complaints that she has received.

23. On direct examination, Plaintiff Kennedy testified as to her knowledge of architectural barriers and their presence:

Q. Pat, you have heard the term barrier access, have you not?

A. Yes.

Q. When you were at the Subway, did you observe any barriers for access–barriers, do you know the technical term for barrier, do you know what it is?

13

Case No. 8:13-CV-3158-T-17TGW

    A.  As far as numbers and statutes and stuff, No, I don't touch that; it's way out of my league.

    Q.  You would know, for example, that the door was too narrow to get the wheelchair through, correct?

    A.  Yes, I would know from personal experience there's a problem.

Through the testimony of Plaintiff Kennedy, based on her knowledge, photographs of the alleged violations as to pipe wrap, height of the soap dispensers (men's and women's restroom), height of the men's urinal, the flush control, the paper towel dispenser, the length of the rear grab bars, inadequate floor space blocked by the garbage can, and the door hardware were admitted into evidence. (Plaintiffs' Trial Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19)

24. On direct examination, Plaintiff Kennedy further testified that she returned to Subway #468:

    Q.  Pat, since this visit in 2013, have you been back to the particular Subway involved in this case?

    A.  Yes.

    Q.  When?

    ......

    A.  I went there yesterday and ordered a sandwich and cookies and a drink.

    Q.  Did you observe any barriers to access on that occasion?

    A.  Yes, the trash can is still blocking the space. The biggest thing was the pipes that were wrapped that wrapping had come down and left those pipes exposed so they weren't maintaining that.

    Q.  Were you taking any measurements or photographs or just looking?

Case No. 8:13-CV-3158-T-17TGW

A. No, just looking.

Q. Would you go back to the Subway again?

A. Absolutely.

Q. Why?

A. Well, the law requires me to do so but the basic thing is I'm a Subway nut.  I love my BMT and I love my cookies.

Q. Other than yesterday, when was the last time you ate at a Subway restaurant?

A. Last week.

Q. And you eat at Subways regardless of where you are, correct?

A. Yes.

Q. Would you go out of your way to eat at a Subway restaurant?

A. I believe I would.  That's one of my favorite places to go, so...

25.  On cross-examination, Plaintiff Kennedy further testified as to Plaintiff's return to Subway #468:

Q. Now you stated in your direct here that you visited the Subway yesterday, correct?

A. Correct.

......

Q. Yesterday you didn't bring a camera with you, correct?

A. I didn't have anything, no.

Q. But you went there with Mr. Lowell, correct?

A. Correct.

15

Case No. 8:13-CV-3158-T-17TGW

> Q. So you would agree based on your testimony that other than the two issues that you talked about, the insulated pipes and the trash can, all the other matters that you had seen on November 20, 2013, they had been rectified, correct?
>
> A. It seems that's the case, correct.

26. On cross-examination, Plaintiff Kennedy testified that on November 20, 2013, Plaintiff Kennedy was staying near the Courthouse:

> Q. Miss Kennedy do you recall or does it refresh your memory what you stated on November 21st was that you staying near the Courthouse in the area?
>
> A. If I said that then I guess I did. I come here so many times it all becomes a blur. If I said that then, then it had to be the truth.
>
> Q. Fair enough?
>
> A. Yeah.
>
> Q. Are you aware of how many Subways you passed between the area you were staying in Tampa to travel to Mr. Zigman's restaurant?
>
> A. No.

27. On cross-examination, on being shown a demonstrative aid of the Courthouse area, and the locations of Subway restaurants in relation to the Courthouse area, Plaintiff Kennedy testified that the demonstrative aid showed approximately ten Subway restaurants which Plaintiff did not visit that were closer to the Courthouse area than Subway #468.

28. Based on the testimony of Plaintiff Patricia Kennedy, photographs of the alleged architectural barriers involving the restrooms of Subway #468 were admitted into evidence. (Plaintiffs' Trial Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19). One photograph, Plaintiffs' Trial Exhibit #17, was admitted into evidence based on the

Case No. 8:13-CV-3158-T-17TGW

testimony of Peter Lowell.

29.   Peter Lowell appeared at trial and testified in his capacity as Plaintiffs' expert witness for ADA compliance on April 6, 2015.  On direct examination, Peter Lowell testified that he performed an inspection of Subway #468 on November 20, 2013.  The report of Peter Lowell dated November 30, 2013 was admitted into evidence. (Plaintiffs' Trial Exh. 1).

30.   Peter Lowell testified that he was present at the trial on November 21, 2013, and he became aware Mr. Zigman's financial condition in a very superficial manner, such that he was barely aware of Mr. Zigman's financial condition.  Peter Lowell testified that the alleged violations in his inspection report were designated to be readily achievable based on the amount of work involved in making the changes.

31.   The inspection report of Peter Lowell contains no cost estimate of the modifications that would cure Defendant's alleged noncompliance with applicable Accessibility Standards as to the restrooms of Subway #468 on November 20, 2013.

32.   At trial, Peter Lowell testified that in his report he did not explain how to fix each element alleged to be in violation of the ADA standards, did not review any financial statements of EDZ, Inc or Mr. Zigman, and did not investigate how many employees the restaurant had.

33.   On cross-examination, Peter Lowell was questioned as to the circumstances in general that brought him, along with Patricia Kennedy, to Subway #468 on November 20, 2013:

> Q.   On behalf of Mrs. Kennedy, how many times have you been hired to provide inspections or testimony?

17

Case No. 8:13-CV-3158-T-17TGW

    A.   I'm...how many times, well....I'm having trouble with your term of "hired."  I don't know...this is not...it's not just hired like...I go out and they hired me to do it.

    Q.   Can you please explain that for me?

    A.   The...the work that I do with Miss Kennedy is sporadic.....If I'm traveling with Miss Kennedy and she encounters a barrier I document it at that time.  It's not that....it's not that I have been hired to go and document that particular barrier.

    Q.   So Miss Kennedy doesn't actually pay you to conduct inspections, correct?

    A.   Miss Kennedy does not pay me to do inspections.

    Q.   Does the company Access for the Disabled pay you to conduct inspections?

    A.   No.

    Q.   Do law offices pay you to conduct inspections?

    A.   Yes.

34. Plaintiffs requested, and were granted, leave to perform a Rule 34 inspection of the restrooms at Subway #468, but Peter Lowell did not return to perform a Rule 34 inspection.

35. Peter Lowell testified that he returned to Subway #468 on April 5, 2015, and saw that there are now two unisex restrooms, one which is designated handicapped accessible.  Peter Lowell testified that the restroom designated handicapped accessible had pipe wrap that was falling off, and a garbage can that was blocking the accessible clear floor space access to the paper towel dispenser.  Peter Lowell denied that he took any measurements.

18

Case No. 8:13-CV-3158-T-17TGW

36.   No photographs of the architectural barriers that existed as to the restrooms of Subway #468 on April 5, 2015 were admitted into evidence.

37.   Edward Zigman appeared and testified at the trial relating to Subway #468 on April 8, 2015.  On direct examination, Mr. Zigman testified that after being served with process in Case No. 8:12-CV-2186-T-EAJ, he hired a company to perform a survey of both Subway stores to tell Mr. Zigman what was wrong.  Mr. Zigman testified that, after he received the report of their inspection of Subway #468 on October 19, 2012, he began to make changes to Subway #468.

38.   On direct examination, Mr. Zigman further testified that Subway #468 was just about breaking even, and he paid for modifications out of his own pocket.

39.   On direct examination, Mr. Zigman testified that he made Plaintiff's attorney aware of his personal bankruptcy and the financial condition of Subway #468 at the time of his deposition on July 22, 2013.

40.   On direct examination, Mr. Zigman testified that he obtained a $3,000 loan to pay for modifications to Subway #468.

41.   On direct examination, Mr. Zigman testified that he replaced the torn pipe wrap in the unisex restroom of Subway #468 on April 7, 2015, and that there is now an "X" on the floor to show where the garbage can should be.  Mr. Zigman further testified that he purchased another garbage can that will be installed on the wall.

42.   On direct examination, Mr. Zigman testified that all employees must read and sign a document that explains Subway #468's  plan for ADA compliance, and the requirement to maintain the plan.

Case No. 8:13-CV-3158-T-17TGW

43.  Defendant's Trial Exhibits include the following:

| | | | |
|---|---|---|---|
| Ex. F | Billy the Sunshine Plumber (Move drains both restrooms) | 12/26/2013 | $ 1,566.44 |
| Ex. G | Home Depot (grab bars) | 12/26/2013 | 73.76 |
| Ex. H | Smartsign.com (reserved parking - handicapped symbol) | 1/8/2014 | 30.44 |
| Ex. I | WDC, Inc. (Proposal for remodel) | 3/28/2014 | $6,219.45 |
| Ex. L. | WDC, Inc. (Adjusted Proposal for remodel) | 6/17/2014 | $6,000.00 |
| Ex. P | DesignIt Architecture (Construction Documents) | 7/11/2014 | 650.00 |

44.  Robert E. Gregg, Defendant's expert witness, inspected the restrooms at Subway #468. He initially inspected and provided a report dated July 10, 2014. (Def. Trial Exh. A). Mr. Gregg inspected again and provided a report as to accessibility dated January 6, 2015, with attached photographs, which states that "[t]he original development of the Subway shop was in July of 1988, at which time the toilet rooms were ADA compliant per the required codes for the State of Florida." The report further states that, due to cost and the lack of space, the remodeling of the restrooms to comply with the 2010 Florida Building Code limits the wheelchair accessibility to one unisex restroom, which is indicated by signage on the door. The report further indicates that the following code requirements have been meet:

| | |
|---|---|
| Section 308.2.1 | Unobstructed High Reach |
| Section 604 | Water Closets and Toilet Compartments comply with 604.2 through 604.9, which includes grab bars |
| Section 606 | Lavatories and Sinks: 606.2 Clear Floor Space with 305 forward approach and knee and |

20

Case No. 8:13-CV-3158-T-17TGW

> toe clearance
> 606.3 Height
> 606.4 Faucets
> 606.5 Exposed Pipes

The report further states that the additional toilet has been modified to comply with the elements being mounted at accessible heights and grab bars the proper lengths but it does not comply with the current requirements to allow for wheelchair clearances. Therefore, it is not indicated as wheelchair accessible. (Def. Trial Exh. B).

## III.  Conclusions of Law

A.  Jurisdiction

1.  The Court has jurisdiction as to Plaintiffs' claims pursuant to 28 U.S.C. Sec. 1331, federal question jurisdiction.  Plaintiffs' claims are premised on alleged violations of 42 U.S.C. Sec. 12182(b)(2)(iv), (v), as well as the Florida Accessibility Code.

2.  The relief available to Plaintiffs includes injunctive relief, and the award of attorney's fees, litigation expenses and costs:

> (2) Injunctive relief.  In the case of violations of sections 302(b)(2)(A)(iv) and [section] 303(a) [42 USCS §§ 12182(b)(2)(A)(iv) and 12183(a)], injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by this title [42 USCS §§ 12181 et seq.].  Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by this title [42 USCS §§ 12181 et seq.].

See 42 U.S.C. Sec. 12188(a)(2); see also 42 U.S.C. Sec. 12205 (the court may allow the prevailing party a reasonable attorney's fee, including litigation expenses and costs).

21

Case No. 8:13-CV-3158-T-17TGW

3.   The Court has an independent duty to review standing as a basis for jurisdiction at
any time, for every case it adjudicates.  See Florida Ass'n of Medical Equipment
Dealers v. Apfel, 194 F.3d 1227, 1230 (11ᵗʰ Cir. 1999).

4.   A party who invokes federal jurisdiction has the burden of establishing it has
satisfied the "case or controversy" requirement of Article III of the Constitution.  "[T]he
irreducible constitutional minimum of standing contains three elements: 1) an 'injury in
fact,'–an invasion of a legally protected interest  that is (a) concrete and particularized
and (b) "'actual or imminent, not 'conjectural' or 'hypothetical'";  2)  a causal connection
between the asserted injury and the conduct complained of; and 3) it must be 'likely' as
opposed to merely 'speculative',  that the injury 'will be redressed by a favorable
decision.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)(citations omitted);
Shotz v. Cates, 256 F.3d 1077, 1081 (11ᵗʰ Cir. 2001).  The evidence relevant to the
standing inquiry consists of the facts as they existed at the time the plaintiff filed the
complaint.  Lujan, 504 U.S. at 569 n. 4.   When injunctive relief is sought, a plaintiff
"must show a sufficient likelihood that he will be affected by the allegedly unlawful
conduct in the future."  Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262,
1284 (11ᵗʰ Cir. 2001).   A party has standing to seek injunctive relief only if the party
shows "a real and immediate–as opposed to a merely conjectural or hypothetical–threat
of future injury."  Id.

5.   Defendant EDZ, Inc. has challenged Plaintiff Patricia Kennedy's standing to seek
injunctive relief for Plaintiff's Title III claim, based on the absence of a real threat of
future harm.   Defendant EDZ, Inc. asserted Plaintiff's knowledge of Defendant's plan to
remediate any ADA violations, Plaintiff's litigation motive, Plaintiff's tester status, and
the distance from Plaintiff Kennedy's residence.

Case No. 8:13-CV-3158-T-17TGW

6.   One way in which a plaintiff can establish a real threat of future injury by showing a plaintiff's intent to return to a place of public accommodation which is noncompliant. Other courts have considered the following factors: 1) the proximity of the plaintiff's residence to the place of public accommodation; 2) the plaintiff's past patronage of the establishment; 3) the definiteness of the plan to return; and 4) the plaintiff's frequency of nearby travel. See Houston v. Marod Supermarkets, Inc., 733 F.3d 1323 (11th Cir. 2013).

7.  Plaintiff Kennedy testified that she went to Subway #468 on November 20, 2013, returned to Subway #468 on April 4, 2015, and would return to Subway again in the future.   Plaintiff Kennedy testified that she has returned to the Tampa Bay Area at least three times a year for the last few years, and that she likes to eat at Subway restaurants.

8.  Subway #468 is far from Plaintiff's residence, and Plaintiff Kennedy alone cannot drive herself.  Plaintiff Kennedy did not patronize Subway #468 in the past, and there is no evidence that Plaintiff Kennedy routinely drives past Subway #468 when Plaintiff Kennedy is visiting this area.  Plaintiff Patricia Kennedy encountered architectural barriers to access when Plaintiff Kennedy went to Subway #468 on November 20, 2013, and the barriers to access still existed as of the date this lawsuit was filed, December 17, 2013.  Plaintiff Kennedy did in fact return to Subway #468 in April, 2015, and Plaintiff Kennedy testified that Plaintiff intended to return in the future.  Plaintiff Kennedy testified that she returns to the Tampa Bay area several times a year.  There is no evidence that Plaintiff Kennedy was deterred from returning to Subway #468.  The Court concludes that Plaintiff Patricia Kennedy had standing to seek injunctive relief as of December 17, 2013.

9.   An association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are

Case No. 8:13-CV-3158-T-17TGW

germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit. Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs. (TOC), Inc., 528 U.S. 167 (2000)(citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977)).   Because Plaintiff Kennedy has standing, Plaintiff Access for the Disabled, Inc. has standing.

B. Standards

1.   The ADA prohibits discrimination against an individual on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. See 42 U.S.C. Sec. 12182(a).

2.   For the purposes of 42 U.S.C. Sec. 12182(a), discrimination includes:

> (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, ...where such removal is readily achievable; and
>
> (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

See 42 U.S.C. Sec. 12182(b)(2)(iv), (v).

3.   The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." See 42 U.S.C. Sec. 12181(9).

4.   The factors to be considered in evaluating whether removal of a barrier is "readily achievable" include:

Case No. 8:13-CV-3158-T-17TGW

    (A) the nature and cost of the action needed under this Act;

    (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

    (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

    (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

See 42 U.S.C. Sec. 12181(9).

5.    Whether the removal of an  architectural barrier is "readily achievable" must be made on a case by case basis, in light of the particular circumstances presented and the factors in 42 U.S.C. Sec. 12181(9).

6.    The Supreme Court has held that the exception for difficulty, in the context of the determination of "readily achievable", is not limited to the costs of requested modifications, but includes the impact upon the operation of the facility.  Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 135 (2005)(quoting 42 U.S.C. Sec. 12181(9)(B)).

7.  Congress delegated to the Department of Justice the responsibility for issuing regulations to carry out the provisions of the ADA, including accessibility standards for facilities.  See 42 U.S.C. Sec. 12186(b).

8.  The Architectural and Transportation Barriers Compliance Board ("Access Board") developed accessibility guidelines that were to serve as standards for the removal of

Case No. 8:13-CV-3158-T-17TGW

architectural barriers in facilities covered by the equal opportunity law for people with disabilities. The Access Board promulgated guidelines entitled the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"). The ADAAG is not legally binding for ADA Title III purposes. The Department of Justice adopted those guidelines in 1991 and renamed them the "Standards for Accessible Design" ("Accessibility Standards"). See 42 U.S.C. Sec. 12186(c). The Accessibility Standards, then codified in 28 C.F.R. Part 36, App. A, constitute legally binding regulations.

9. The Accessibility Standards applied only to newly constructed and altered facilities, not to existing facilities. See 28 C.F.R. Part 36, App. A at 1. A "newly constructed" facility was a facility constructed for first occupancy after January 26, 1993; an "altered facility" was a facility altered after January 26, 1992.

10. The Accessibility Standards imposed different requirements on the owners and operators of facilities that existed prior to its enactment date. This reflects the intent of Congress to "protect existing businesses from undue hardship." See Pinnock v. Int'l House of Pancakes Franchisee, 844 F.Supp. 574, 578-90 (S.D. Cal. 1993).

11. For facilities that existed prior to the enactment date, the ADA provides that discrimination includes a private entity's failure to remove architectural barriers where such removal is readily achievable. See 42 U.S.C. Sec. 12182(b)(2)(A)(iv).

12. For facilities which were constructed post-ADA (new construction and post-ADA alterations), the ADA imposes a heightened standard:

> [W]ith respect to a facility or part thereof that is altered by, on behalf of, or for use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

26

Case No. 8:13-CV-3158-T-17TGW

42 U.S.C. Sec. 12183(a)(2).


13.  The Department of Justice has adopted revisions to the ADAAG since the first

Accessibility Standards in 1991.  The Department of Justice adopted the 2010 revised

ADAAG, which required compliance with the 2010 Standards for new construction and

alterations by March 15, 2012.  March 15, 2012 was also the compliance date for

barrier removal.  The 2010 Standards include the 2004 ADAAG and the requirements

contained in 28 C.F.R. Part 36 subpart D. See Nondiscrimination on the Basis of

Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg.

56,236, 56237, 56238 (Dep't of Justice Sept. 15, 2010)("Final Rule").


14.  In addition to the Accessibility Standards promulgated by the Department of

Justice, the Department of Justice has published a Technical Assistance Manual.  The

Technical Assistance Manual, as the Department of Justice's interpretation of its own

regulations, is entitled to substantial deference.


15.  The Attorney General may certify that a State law or local building code that

establishes accessibility requirements meets or exceeds the minimum requirements of

the ADA for the accessibility and usability of covered facilities.  See 42 U.S.C. Sec.

12188(b)(1)(A)(ii).


16.  The 1997 Florida Accessibility Code was certified by the Department of Justice.

The Florida Building Commission updated the Florida Accessibility Code for Building

Construction for consistency with the 2010 ADA standards and Florida law, Part II,

Chapter 553 in the summer of 2011, but at the time of this trial, review and certification

of the 2012 Florida Accessibility Code was not complete.  Code certification provides a

presumption of compliance with the ADA for private entities.  The 2012 Florida

Accessibility Code adopts and incorporates the federal ADA Standards for Accessible

Design and the related regulations in 28 C.F.R. Parts 35 and 36.  See Secs. 553.502,

Case No. 8:13-CV-3158-T-17TGW

553.503, <u>Florida</u> <u>Statutes</u>.


17.    Plaintiffs' claims are based on the presence of architectural barriers at Subway
#468, Subway #468's policies, practices and procedures, and the maintenance of
accessible features at Subway #468.  <u>See</u> 42 U.S.C. Sec. 12182(b)(2)(A)(ii), 12182
(b)(2)(A)(iv).


18.  The regulations which control the issues in this case are 28 C.F.R. Part 36.302
(modification of policies, practices and procedures); 28 C.F.R. Part 36.304 (barrier
removal); 28 C.F.R. Part 36.406 (standards for new construction and alterations), and
28 C.F.R. Part 36.211 (maintenance of accessible features).   The obligation to remove
architectural barriers is a continuing obligation to remove barriers that arise, or are
deemed barriers, after construction.  <u>See</u> Department of Justice <u>Technical Assistance</u>
<u>Manual</u>, III-4.4400.   28 C.F.R. Part 36.304(c) recommends the priorities that a place of
public accommodation should follow in removing barriers.  The DOJ Technical
Assistance Manual explains that the purpose of those priorities is to facilitate long-term
business planning and to maximize the degree of effective access that will result from
any given level of expenditure.  The priorities are not mandatory and a public
accommodation is free to exercise discretion in determining the most effective
"mix" of barrier removal measures to undertake.  <u>See</u> Department of Justice <u>Technical</u>
<u>Assistance Manual</u>, III-4.4500.    28 C.F.R. Part 36.304(d) explains the relationship of
barrier removal to the alterations requirements of subpart D of this regulation, identifies
the safe harbor available to elements in existing facilities, and identifies the elements
not eligible for the safe harbor.


19.     Plaintiffs' <u>prima</u> <u>facie</u> case depends on Plaintiffs' ability to establish that:
(1) Plaintiff Kennedy is disabled; 2) that Subway #468 is a place of public
accommodation; and 3) Plaintiff Kennedy was denied full and equal treatment
enjoyment of the goods, services, facilities or privileges offered by Defendant on the

Case No. 8:13-CV-3158-T-17TGW

basis of her disability. <u>See</u> <u>Shotz v. Cates</u>, 256 F.3d 1077, 1079 (11th Cir. 2001).

20.  Noncompliance with the ADA Standards for Accessible Design is not tantamount to finding an ADA violation; a plaintiff carries the additional burden of showing that removal of the architectural barriers is readily achievable. <u>See</u> <u>Access Now, Inc. v. S. Fla. Stadium Corp.</u>, 161 F.Supp.2d 1357 (S.D. Fla. 2001) (citing <u>Colorado Cross Disability Coalition v. Hermanson Family L.P.</u>, 264 F.3d 999 (10th Cir. 2001)).

21.  In <u>Garthright-Dietrich v. Atlanta Landmarks, Inc.</u>, 452 F.3d 1269 (11th Cir. 2006), the Eleventh Circuit Court of Appeals followed the approach of <u>Colorado Cross Disability Coalition v. Hermanson Limited Partnership</u>, 264 F.3d 999 (10th Cir. 2001), in which a plaintiff has the initial burden of production to show: 1) that an architectural barrier exists; and 2) that a proposed method of architectural barrier removal is "readily achievable," i.e. easily accomplishable and able to be carried out without much difficulty or expense under the particular circumstances of the case.  If the plaintiff meets this burden, the defendant then bears the ultimate burden of persuasion that barrier removal is not "readily achievable."

22.  To meet the <u>Colorado Cross Disability Coalition</u> standard, a plaintiff must present sufficient evidence so that a defendant can evaluate a proposed solution to a barrier, the difficulty of accomplishing it, the cost implementation, and the economic operation of the facility.  Without evidence on these issues, a defendant cannot determine if it can meet its subsequent burden of persuasion.    <u>Garthright-Dietrich v. Atlanta Landmarks, Inc.</u>, 452 F.3d at 1279.

23. If Plaintiffs make the initial showing, Defendant has the opportunity to rebut Plaintiffs' case by showing that removal of the disputed barrier could not be accomplished without much difficulty or expense. <u>See</u> <u>Access Now, Inc. v. S. Fla. Stadium Corp.</u>, 161 F.Supp.2d 1357 (S.D. Fla. 2001) (citing <u>Parr v. L&L Drive-Inn</u>

Case No. 8:13-CV-3158-T-17TGW

Restaurant, 96 F.Supp.2d 1065, 1085 (D. Haw. 2000); Pascuiti v. New York Yankees
1999 U.S. Dist. LEXIS 18736 (S.D.N.Y. Dec. 6, 1999)).

C.  This Case

1.  The Parties stipulated that Plaintiff Kennedy is a person with a disability and
Defendant's restaurant is a place of public accommodation.  (Dkt. 63, p. 4).

2.  The Parties further stipulated:   At the commencement of this lawsuit, the
Defendant's property did not comply with the ADA.  (Dkt. 63, p. 5).

3.  The Parties further stipulated:

> Defendant has been sued previously for ADA violations at a second
> Subway restaurant that it owns and operates.  On August 28, 2014, the
> Court entered final judgment in favor of the Plaintiffs here finding that the
> Defendant has violated the ADA and ordering those violations to be
> remedied.  Access for the Disabled, Inc., etc., et al. v. EDZ, Inc., etc; Case
> No. 8:12-CV-2186 -T-EAJ (M.D. Fla.).

> During the pendency of the aforementioned case, Plaintiff learned of this
> Subway, and its ADA violations.  The Plaintiff also knew that the
> Defendant claimed it planned to remediate those violations and other
> areas of the Subway.  (Dkt. 63, p. 5).

4.  The 1991 Standards include the following definition of "element": "An architectural or
mechanical component of a building, facility, space or site, e.g. telephone, curb ramp,
door, drinking fountain, seating, or water closet."

5.   Subway #468 was an existing facility placed in service by Defendant in July, 1988,
prior to the time the DOJ adopted the Standards for Accessible Design.  As an existing
facility, Subway #468 was not required to comply with the Standards for Accessible

30

Case No. 8:13-CV-3158-T-17TGW

Design published by the DOJ on July 26, 1991 (republished as Appendix D  to 28 CFR

Part 36).   The 2010 Standards for Accessible Design incorporate the 2004 ADAAG

and the requirements contained in subpart D of 28 CFR Part 36.  The 2010 Standards

include technical and scoping specifications for elements that were not addressed in

the 1991 Standards (supplemental requirements) as well as revisions to technical and

scoping specifications for certain elements that were addressed in the 1991 Standards.

Once the 2010 Standards went into effect, in light of Defendant's continuing obligation

to remove architectural barriers, Defendant was required to assess whether any

covered barriers were present.    Elements in existing facilities which were not altered

on or after March 15, 2012, and  which complied with corresponding technical and

scoping specifications for those elements in the 1991 Standards, were within the safe

harbor.  See 28 CFR Part 36.304 (d)(2)(i).  Elements in existing facilities which were not

in compliance with the corresponding technical and scoping specifications for those

elements in the 1991 Standards were not within the safe harbor.  28 CFR 36.304

(d)(ii)(B) provides that, "on or after March 15, 2012, elements in existing facilities that do

not comply with the corresponding technical and scoping specifications for those

elements in the 1991 Standards must be modified to the extent readily achievable to

comply with the requirements in the 2010 Standards."  See 28 CFR

36.304(d)(ii)(B)(effective date Sept. 15, 2010).   After March 15, 2012, in order to

determine if any element within Subway #468 was within the safe harbor, Defendant

was required to assess, on an element by element basis, whether each  element which

had not been altered was in compliance with the 1991 Standards.   If that element was

not in compliance, Defendant was required to modify that element to the extent readily

achievable.


6.  Defendant EDZ, Inc. has not established that each barrier to access encountered

by Plaintiff Kennedy at the first visit to  Subway #468, and which had not been altered

at that time, was in compliance with the 1991 Standards, such that each barrier to

access was within the safe harbor.   Defendant EDZ, Inc. stipulated that, at the

Case No. 8:13-CV-3158-T-17TGW

commencement of this lawsuit, the property was not in compliance with the ADA.

7.   However, after considering the record evidence and argument, the Court concludes that Plaintiffs have not provided sufficient competent evidence establishing their prima facie case.  Plaintiffs established that there were architectural barriers, but did not propose a method of architectural barrier removal, and did not establish that the removal of architectural barriers was readily achievable, based on the factors in 42 U.S.C. Sec. 12181(9).

8.   The trial testimony of Plaintiff's ADA compliance expert witness, Peter Lowell, as to the cost of removal of the architectural barriers is insufficient to establish that the removal of barriers was readily achievable at the time Plaintiffs encountered the barriers.  Peter Lowell testified he did not know the financial resources available to Defendant EDZ, Inc. or the number of employees at Subway #468.

9.   Defendant EDZ, Inc. identified modifications to Subway #468 that Defendant EDZ, Inc. planned to make prior to the commencement of this lawsuit, by obtaining a report from National ADA Accessibility Compliance Network, Inc.   Mr. Zigman made some of the modifications himself. The restrooms of Subway #468 were altered to make them accessible to the maximum extent feasible in 2014.

10.   Even if it were to be determined that Plaintiffs did establish a prima facie case, Plaintiffs do not dispute that all of the architectural barriers identified in the Complaint were remedied by the time Plaintiffs returned to Subway #468 in April, 2015, aside from the pipe wrap and garbage can.   Plaintiffs' claims are moot as to the elements which have been remedied.  See Brother v. CPL Invs., Inc., 317 F.Supp.2d 1358 (S.D. Fla. 2004).

Case No. 8:13-CV-3158-T-17TGW

11.     On the date of Plaintiff Kennedy's first visit to Subway #468, the pipes in the restroom partly wrapped in a black foam material, and partly completely unwrapped. After the restroom was altered, the pipes were wrapped with a white wrap.  On the date of the second visit to Subway #468, Plaintiff Kennedy and Peter Lowell testified the pipe wrap had deteriorated and was falling off.

12.   Defendant's expert witness visited and inspected the restrooms at Subway #468; Defendant's expert witness testified that the restrooms were in compliance on the dates of those inspections.

13.   The pipe wrap is an element that is subject to maintenance.  28 C.F.R. Part 36.211 does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

14.   As to the pipe wrap, the Court credits the testimony of Edward Zigman that Mr. Zigman replaced the torn pipe wrap on April 7, 2015, that Defendant EDZ, Inc. has a policy of maintaining accessible features, and the employees of Subway #468 are aware of Subway #468's policy of ADA compliance, based on a written policy each employee must read.

15.   As to the garbage can, it is a moveable rather than a fixed element, and the Parties dispute whether the placement of the garbage can is a violation of the applicable Standards.  The Court credits Mr. Zigman's testimony that the floor has been marked to show the correct place for the garbage can, and Mr. Zigman ordered a garbage that is to be attached to the wall rather than sitting on the floor.

16.   A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice....A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful

33

Case No. 8:13-CV-3158-T-17TGW

behavior could not reasonably be expected to recur. <u>Sheely v. MRI Radiology Network,</u>
<u>P.A.</u>, 505 F.3d 1173, 1184 (11th Cir. 2007). In determining mootness where a private
defendant has voluntarily ceased the conduct at issue, the Court considers: 1) whether
the challenged conduct was isolated or unintentional, as opposed to a continuing and
deliberate practice; 2) whether the defendant's cessation of the offending conduct was
motivated by a genuine change of heart or timed to anticipate suit; and 3) whether, in
ceasing the conduct, the defendant has acknowledged liability. <u>Id.</u>

17. Even though a case is not moot, injunctive relief is not automatically warranted. A
plaintiff must establish by a preponderance of the evidence that a permanent injunction
is necessary. <u>See United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953); <u>United</u>
<u>States v. Concentrated Phosphate Export Ass'n</u>, 393 U.S. 199, 203-04 (1968).

18. As to whether the challenged conduct is isolated or unintentional, as opposed to a
continuing and deliberate practice, the evidence is disputed. The entry of a final
judgment against Defendant as to Subway #336, followed by this lawsuit, is some
evidence of a continuing and deliberate practice. Mr. Zigman testified that he became
aware of the ADA in 2012, when he was served with a summons and complaint for
Subway #336. After Mr. Zigman received a report on Subway #468, he began to make
changes, as his personal finances permitted. The Court recognizes that Mr. Zigman
had the subjective intention to comply prior to the commencement of this lawsuit but
was unable to fund all the modifications to remedy the alleged ADA violations at that
time. However, the ADA, and related Standards and regulations, have been in effect
for a long time, and are designed to combat benign neglect as well as intentional
discrimination.

19. As to whether Defendant's cessation of the offending conduct was motivated by a
genuine change of heart, or timed to anticipate suit, the evidence is disputed. Mr.
Zigman developed a plan to modify Subway #468 prior to the date this lawsuit was filed.

34

Case No. 8:13-CV-3158-T-17TGW

Mr. Zigman testified in his deposition that modifications to the store were motivated by
Mr. Zigman's awareness of the ADA.   At trial, Mr. Zigman testified that, after being
sued for ADA violations relating to his Subway #336, Mr. Zigman obtained a survey
report because he didn't want to get sued for ADA violations as to Subway #468.

20.   As to whether Defendant, in ceasing the conduct, acknowledged liability, the Court
notes that Defendant stipulated that, at the commencement of this lawsuit, Subway
#468 did not comply with the ADA.

21.  After consideration, the Court finds that Defendant has not met the heavy burden
of establishing that it is absolutely clear that the allegedly wrongful behavior could not
reasonably be expected to recur.   This case is therefore not moot such that Defendant
is entitled to a dismissal as a matter of right.

22.   However, the fact that Defendant developed a plan prior to the commencement of
this lawsuit, paid for some modifications and borrowed money when necessary for more
substantial modifications, carried out the plan over an extended period of time, and
completed alterations to  make the restrooms at Subway #468 accessible convinces the
Court that  injunctive relief is not appropriate or necessary to assure that Subway #468
complies with its continuing duty to remove architectural barriers, maintain accessible
features, and modify its policies to afford full and equal enjoyment of Defendant's
goods, services, facilities, privileges, advantages or accommodations to individuals with
disabilities.   Mr. Zigman testified that Defendant modified its policies prior to his
deposition in July, 2013. After the commencement of this lawsuit, the restrooms were
renovated to comply with the 2010 Standards to the maximum extent feasible; there is
no possibility that those renovations can be "undone." Mr. Zigman acted promptly to
repair a feature that required maintenance, and to resolve the alleged barrier to access
involving  placement of the restroom garbage can.

Case No 8:13-CV-3158-T-17TGW

23.    The Clerk of Court shall enter a final judgment in favor of Defendant EDZ, Inc. as to Plaintiffs' claims under the ADA and Florida Accessibility Code.  Because the Court has not granted injunctive relief to Plaintiffs, the Court denies Plaintiffs' request for the award of attorney's fees and costs.


**DONE and ORDERED** in Chambers in Tampa, Florida on this ___ day of February, 2016.


ELIZABETH A. KOVACHEVICH
United States District Judge


Copies to:
All parties and counsel of record